**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| v. ) | |
| ) | **Case No. 1:16-cr-193** |
| **NAM QUOC HOANG,** ) | |
|    **Defendant.** ) | |

**MEMORANDUM OPINION**

At issue pretrial in this prosecution for interstate stalking and domestic violence is whether defendant's statements during a video-recorded, custodial interview with law enforcement must be suppressed on the ground that defendant, despite initially waiving his *Miranda*[1] rights, adequately invoked his right to remain silent sometime after his waiver and the commencement of the interview.

An Eastern District of Virginia grand jury has indicted defendant Nam Quoc Hoang on the following eight counts: (1) transmitting communications with the intent to extort, in violation of 18 U.S.C. § 875; (2) cyberstalking, in violation of 18 U.S.C. § 2261A(2)(B); (3) stalking, in violation of 18 U.S.C. § 2261A(1); (4) conspiracy to commit stalking, in violation of 18 U.S.C. § 371; (5) interstate domestic violence, in violation of 18 U.S.C. § 2261; (6) using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); (7) possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1); and (8) possessing ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1).[2]

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] *See United States v. Hoang*, No. 1:16-cr-193 (E.D. Va. Nov. 17, 2016) (Second Superseding Indictment) (Doc. 32). The second superseding indictment named a co-defendant and co-

On June 29, 2016, law enforcement officers arrested defendant and conducted a recorded, custodial interview that lasted approximately three and a half hours. Although defendant explicitly concedes that he knowingly, intelligently, and voluntarily waived his *Miranda* rights at the beginning of the interview, he contends that approximately 20 minutes into the interview he unambiguously and unequivocally invoked his right to remain silent. Accordingly, defendant has moved to suppress any statements he made in the course of that custodial interview following his invocation of the right to silence. In response, the government contends that defendant's invocation was ambiguous and equivocal, and that therefore the motion to suppress must be denied.

Thus, the question presented is whether defendant unambiguously and unequivocally invoked his right to remain silent following his initial waiver of his *Miranda* rights. As the matter has been fully briefed and argued orally, it is now ripe for disposition. For the reasons that follow, defendant's motion to suppress must be granted.

I.[3]

In May 2013, defendant, a resident of Fairfax County, Virginia, began dating a woman ("the Victim") who lives in Montgomery County, Maryland. During their relationship, which progressed to intimacy, defendant allegedly took sexually explicit photos of the Victim with his cellphone. Defendant and the Victim also allegedly used crack cocaine together. In December 2013, defendant and the Victim ended their relationship, and shortly thereafter defendant began

---

conspirator, Khoa Dang Vu Hoang ("co-conspirator Khoa"), on Counts III and IV. Defendant's trial was severed from co-conspirator Khoa's trial because Khoa made admissions during a custodial interview that implicated defendant. *See Bruton v. United States*, 391 U.S. 123 (1968); *United States v. Hoang*, No. 1-16-cr-193 (E.D. Va. Feb. 10, 2017) (Order). On March 24, 2017, a jury convicted co-conspirator Khoa on both Counts III and IV.

[3] The facts recited here are derived from the second superseding indictment, and thus they are alleged, not proven.

harassing the Victim. As part of this harassment, defendant and his alleged co-conspirator, Khoa, drove to the Victim's house to stalk her. The Victim also allegedly talked to co-conspirator Khoa and stated that she was afraid of defendant. In late December 2013, defendant threatened the Victim that he would publish the sexually explicit photos of her on the internet unless she paid him money.[4]

In January 2014, defendant drove with co-conspirator Khoa to the Victim's house to stalk the Victim. After they determined that the Victim was not at home, defendant broke into her home and stole some of the Victim's personal belongings. Thereafter, on January 25, 2014, defendant published the sexually explicit photos of the Victim on defendant's Facebook page, which a number of people viewed.

That same day, the Victim posted on her Facebook page that she planned to accompany her friends that night to a club in the District of Columbia. Defendant saw the Victim's Facebook post and, together with co-conspirator Khoa, drove to the club to stalk the Victim. In the course of stalking the Victim, Defendant and co-conspirator Khoa parked outside the club and waited for the Victim to emerge from the club. When the Victim left the club and retrieved her valet-parked car, defendant instructed co-conspirator Khoa to follow the Victim, and Khoa did so. Thereafter, the Victim stopped her car at a traffic light and defendant and co-conspirator Khoa stopped their car immediately behind her. Defendant then left co-conspirator Khoa's car, walked to the Victim's car, displayed a handgun to the Victim, and demanded that she let him into her car. She complied. Defendant then entered the Victim's car, struck her in the face, and forced her at gunpoint to drive to Maryland. While defendant was in the Victim's car, defendant maintained

---

[4] The second superseding indictment does not disclose the amount of money defendant is accused of having demanded.

contact with co-conspirator Khoa via cellphone. Defendant directed co-conspirator Khoa to follow the Victim to Maryland, and Khoa did so. Defendant released the Victim in Maryland.

## II.[5]

Defendant, a 41 year-old Vietnamese citizen with permanent legal status in the United States, was arrested on June 29, 2016 by Fairfax County Police officers. Defendant was transported to the Franconia District Police Station where two detectives—Detective Sergeant Robert Grims and Detective Joseph Pittman[6]—and FBI Special Agent Joseph Hoang, a fluent and FBI-certified Vietnamese speaker, interviewed defendant for approximately three and a half hours. As reflected in the video recording, no more than two officers were in the room with defendant at any one time during the course of the interview. Indeed, for substantial portions of the interview, defendant and Special Agent Hoang were alone in the interview room.

Defendant's communications with the detectives were in English, whereas defendant's conversation with Special Agent Hoang was predominantly in Vietnamese.[7] Although defendant is not a native English-speaker, he has lived in the United States for the past 25 years and appeared capable of speaking and understanding English, albeit with occasional grammatical errors. Notably, during the custodial interview, defendant represented to Sergeant Grims that defendant could understand the Sergeant's statements. Furthermore, when Sergeant Grims

---

[5] The following facts are derived from the video recording of defendant's June 29, 2016 custodial interview, and the transcript of that interview. It is also worth noting that the interview transcript, on the top of page 2, reads, "July 29, 2016 –Nam Hoang Interview." *See United States v. Hoang*, No. 1:16-cr-193 (E.D. Va. Feb. 17, 2017) (Gov't Ex. 2B) (Interview Tr.) at 2. This is presumably a typographical error, as the interview date—as time-stamped on the video recording and represented in the government's brief—was June 29, 2016.

[6] Sergeant Grims is employed by the Montgomery County Police Department in Maryland. Detective Pittman is employed by the Fairfax County Police Department in Virginia.

[7] In preparing the interview transcript, FBI linguists Phuong Ngo and Chris Vu translated any Vietnamese into English.

informed defendant of his *Miranda* rights and explained those rights in English, defendant confirmed that he understood his rights, and thereafter defendant knowingly, intelligently, and voluntarily waived those rights, signing a waiver form and agreeing to speak with the detectives.[8] *See United States v. Hoang*, No. 1:16-cr-193 (E.D. Va. Feb. 17, 2017) (Gov't Ex. 2B) (Interview Tr.) at 6.

Shortly after defendant waived his rights, Sergeant Grims left the interview room and Detective Pittman engaged in small talk with defendant, in English, for approximately five minutes. Sergeant Grims then returned and began to read English-translated transcripts of incriminating statements defendant had made in jail telephone calls. Sergeant Grims informed defendant that the jail calls reflected that defendant had admitted to a crime, at which point defendant and Sergeant Grims engaged in the following exchange:

> Defendant: Whatever if you think that I did, [sic] you arrest me."
> Sergeant Grims: That's what, that's what I'm doing.
> Defendant: Yeah, and nothing to talk about.
> Sergeant Grims: What's that?
> Defendant: There's nothing to talk about.
> Sergeant Grims: There's another guy involved in it.
> Defendant: I have no idea, like I said, nothing involve [sic]. I don't steal, I don't go to [the Victim's] house, that's all I say. Whatever you … ah… CD whatever ah… in here… If you already got everything, don't need nothing to talk about [sic]. But for me, I know I don't do nothing.

Interview Tr. at 20. Thereafter, Sergeant Grims stated, "I'm going to read you some of the calls ok," and defendant responded, "I am gonna listen, sir." *Id.* at 22. After Sergeant Grims read another call transcript, defendant laughed and explained what he meant by some of his statements in the phone calls. *Id.* at 23-24. At that point, the following exchange occurred:

---

[8] In this regard, it is worth repeating that defendant does not contest that his initial waiver of his *Miranda* rights was knowing, intelligent, and voluntary. *See, e.g.*, *United States v. Hoang*, No. 1:16-cr-193 (E.D. Va. Feb. 17, 2017) (Hr'g Tr.) at 69:7-15.

> Sergeant Grims: Let me show you what…there's a couple of calls that you said that aren't very good, okay? So just listen a minute.
> Defendant: Okay, go ahead, you read and I don't talk no more.

*Id.* at 24. After saying that he would "talk no more," defendant crossed his arms on the table and put his head down. The conversation continued:

> Sergeant Grims: You don't want to talk no more?
> Defendant: No, no, because it make [sic] me laugh. I don't want to talk no more. I said make me laugh, that's all.
> Sergeant Grims: Can I read you what's—what's in here?
> Defendant: Sure. You do that, yeah. But I don't want—yeah, you—you can read.
> Sergeant Grims: Oh! This is a good one right here. [Reads jail call transcript.] Anyway, I got to read you one more.
> Defendant: Okay, why we [sic] talking about it? Put me in jail.
> Sergeant Grims: Huh?
> Defendant: Put me in jail. We don't have to talk about it.
> Sergeant Grims: Just hear me out, okay?
> Defendant: Yeah. [Brief pause.] I am ready to go to jail.

*Id.* at 24-25. In other words, defendant stated that he did not mind if the police continued reading statements to him, but defendant did not wish to speak further. And after Detective Grims read another call transcript, defendant stated that he wished to cease talking and to be taken to jail.

Immediately after defendant stated that he was ready to go to jail, someone knocked on the door to the interview room, Detective Pittman left the room, and the conversation paused. Following approximately 90 seconds of silence, Sergeant Grims asked defendant to give Grims "five more minutes," announced that the FBI had arrived, and insisted that defendant "Let me just finish this one up." *Id.* Defendant answered, "Crazy." *Id.* Thereafter, Sergeant Grims read some more phone calls to defendant. Special Agent Hoang then joined the interview. Once Special Agent Hoang, who is fluent in Vietnamese, entered the room, most of the interview was conducted in Vietnamese. Special Agent Hoang also orally translated defendants' statements from Vietnamese to English for Sergeant Grims.

6

Shortly after he entered the interview room, Special Agent Hoang asked if defendant had admitted to having stolen the Victim's personal belongings to teach her a lesson. Defendant responded, predominantly in Vietnamese, as follows.[9]

> Defendant: I don't remember that but now that you have prompted me, let me recount a story. Let me shine light on this story. I did not say I was going to teach a lesson or anything like that. *You know*, because that girl, she's crazy.
> Special Agent Hoang: Hmm…
> Defendant: I only know, it's suppose[d] to be that, I don't have to, *I—I have to be silent*.
> Special Agent Hoang: Hmm.
> Defendant: It's suppose[d] to be that *I have to be silent* because the more I talk, it can't be good for me. But reality is the reality. Because the truth is that, those, the reason why when [Sergeant Grims] read it and I laughed
> Special Agent Hoang: Uh-huh
> Defendant: He read it and I laughed…That's right, those things I said but I laughed because I was playing *mind* [games] with *she* [sic] because….

*Id.* at 31-32.

Despite these and earlier statements by defendant, the interview continued for another three hours, during which defendant made some admissions. Thus, the question presented is whether defendant unambiguously and unequivocally invoked his right to remain silent. In short, defendant's clear statements, "Put me in jail. We don't have to talk about it," and "Yeah. I am ready to go to jail," *id.* at 25, were unambiguous and unequivocal assertions of the right to silence.

### III.

In its landmark *Miranda* decision the Supreme Court held that a person who has waived his right to silence during a custodial interview may subsequently invoke that right to halt further questioning. *See* 384 U.S. at 473-74. As the Supreme Court in *Miranda* put it, "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at

---

[9] The italics in the subsequent quotation identify the few words that defendant uttered in English, as opposed to Vietnamese.

7

any time … during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* The Supreme Court has since clarified that "an accused who wants to invoke his or her right to remain silent"—and by extension, to invoke the "right to cut off questioning"—must "do so unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (holding that defendant did not unambiguously invoke his right to silence because he "did not say that he wanted to remain silent or that he did not want to talk with the police" (quotation marks omitted)).[10]

Of course, this rule—that an unambiguous and unequivocal invocation of the right to silence requires officers to cut off questioning—is a "critical safeguard" that "counteracts the coercive pressures of the custodial setting." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *see also Thompkins*, 560 U.S. at 381 (observing that requiring an interrogation to cease upon the suspect's unambiguous invocation of the right to silence "protect[s] the privilege against compulsory self-incrimination" (citing *Mosley*, 423 U.S. at 103)). Put differently, *Miranda* established a prophylactic rule to prevent persistent and skilled police interrogators from convincing suspects to change their minds after an unambiguous invocation of the right not to speak in a custodial interview. *See Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir.1989) (noting that a police officer's statement aimed "at changing [defendant]'s mind" following a *Miranda* invocation is "precisely the sort of conduct the prophylactic rule [announced in *Miranda*] seeks to prevent"). Indeed, once a suspect unambiguously and unequivocally invokes the right to silence—i.e., the "right to cut off questioning"—the interrogators must "scrupulously honor[]" that invocation. *See Mosley*, 423 U.S. at 103-04.

---

[10] In so holding, the Supreme Court adopted the same standard governing the *Miranda* right to counsel. *Compare United States v. Davis*, 512 U.S. 452, 459 (1994) (holding that a "suspect must unambiguously request counsel" to invoke the *Miranda* right to counsel and the right to halt further questioning), *with Thompkins*, 560 U.S. at 381 ("[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*.").

Importantly, however, if the suspect's invocation is merely "ambiguous or equivocal"—that is, if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the [*Miranda*] right"—then the officer need not end the interview. *Davis v. United States*, 512 U.S. 452, 459 (1994) (requiring an invocation of the right to counsel to be "unambiguous" in order for police officers to cease questioning); *see also Thompkins*, 560 U.S. at 381 (adopting the *Davis* standard for invocations of the right to remain silent). Yet, in articulating a sufficiently unambiguous desire to remain silent, a suspect "need not speak with the discrimination of an Oxford don." *Davis*, 512 U.S. at 459 (quotation marks omitted). Moreover, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial [*Miranda*] request itself." *Smith v. Illinois*, 469 U.S. 91, 100 (1984) (addressing whether the state court had properly analyzed whether a defendant had invoked his *Miranda* right to counsel);[11] *see also United States v. Hamidullin*, 114 F. Supp. 3d 388, 392 (E.D. Va. 2015) ("Determining whether an invocation is ambiguous or unequivocal is contextual…. [C]ourts [should] focus only on events prior, not subsequent, to the putative invocation." (citations omitted)).

These principles, applied here, point convincingly to the conclusion that defendant's statements constitute a sufficiently unambiguous and unequivocal invocation of the right to remain silent. Specifically, defendant invoked his right to silence (1) by stating, "I don't talk no more," (2) by declaring, "Put me in jail. We don't have to talk about it," and (3) by answering Sergeant Grims's plea to "hear me out," with the statement, "Yeah. I'm ready to go to jail." Interview Tr. at 24-25. Here, defendant, a non-native English speaker, declared that he wished not to speak further and that he wanted to be transported out of the interview room and to jail.

---

[11] Of course, the Supreme Court in *Smith* noted that "[s]uch subsequent statements are relevant … to the distinct question of waiver." *Smith*, 469 U.S. at 100.

*See Davis*, 512 U.S. at 459 (noting that a suspect "need not speak with the discrimination of an Oxford don" to invoke a *Miranda* right unambiguously (quotation marks omitted)).

Defendant's earlier statements offer further context and confirm that defendant's declarations—"Put me in jail. We don't have to talk about it," and "Yeah. I'm ready to go to jail"—comprised a sufficiently unambiguous invocation of the right to remain silent. Indeed, defendant thrice stated that he had "nothing to talk about." Interview Tr. at 20. And Sergeant Grims, instead of clarifying what defendant meant by those statements, proceeded to read jail phone calls to defendant. Subsequently, defendant stated, "Okay, go ahead, you read and I don't talk no more," and placed his head on the table—another contextual clue that defendant wished to end the interview. *Id.* at 24. To be sure, Sergeant Grims sought to clarify whether defendant did not "want to talk no more," and defendant replied, "No, no, because it make [sic] me laugh. I don't want to talk no more. I said make me laugh, that's all." *Id.* And Sergeant Grims then asked if he could continue reading jail calls, at which point defendant stated "You do that, yeah. But I don't want—yeah, you—you can read." *Id.* But once Sergeant Grims finished reading, defendant insisted, "Okay, why we [sic] talking about it? Put me in jail," and "Put me in jail. We don't have to talk about it." *Id.* at 24-25. In other words, defendant said that he did not mind the police officers reading things to defendant, but defendant did not wish to speak further.

Thus, taken in proper context, defendant's repeated and final protestations—"Put me in jail. We don't have to talk about it," and "Yeah. I'm ready to go to jail"—constitute a sufficiently unambiguous and unequivocal assertion of the right to remain silent. *See, e.g.*, *Tice v. Johnson*, 647 F.3d 87, 107-08 (4th Cir. 2011) (holding that the defendant unambiguously and unequivocally invoked his right to remain silent by telling the interrogator that he "decided not to

say any more" during the interview).[12] Indeed, no reasonable officer, in light of the relevant circumstances, could have "understood only that the suspect *might* be invoking the [*Miranda*] right[.]" *Davis*, 512 U.S. at 459. Rather, Sergeant Grims's response, "Just hear me out, okay?" reflects an understanding that defendant wished to end the interview and cease answering questions. And defendant's answer, "Yeah. I am ready to go to jail," dispels any ambiguity. Interview Tr. at 25.

To be sure, defendant's subsequent statements to Special Agent Hoang, "I have to be silent," are ambiguous, as it is unclear whether those words refer to defendant's *Miranda* rights or to the "story" defendant claimed to be recounting to Special Agent Hoang. *See id.* at 31-32. But this point is immaterial, as any statements defendant offered during the interview following his declaration, "Put me in jail. We don't have to talk about it," and "I am ready to go to jail," must be suppressed.

In opposition to this conclusion, the government offers three arguments. First, the government contends that defendant's statement, "I don't want to talk no more," is ambiguous, and that after defendant repeatedly asked to be taken to jail, defendant told the detectives to "go ahead" with further questioning. This argument is unpersuasive. Indeed, defendant reiterated that

---

[12] *See also Jones v. Harrington*, 829 F.3d 1128, 1139-40 (9th Cir. 2016) ("No fairminded jurist could determine that [defendant]'s invocation was ambiguous [because defendant] stated 'I don't want to talk no more'; in other words, *he did not want to talk anymore*.... [T]he fact that [defendant] spoke to officers for a while before invoking his right to remain silent makes no difference." (citations omitted)); *Campaneria*, 891 F.2d at 1021 (concluding that defendant unambiguously and unequivocally invoked his right to remain silent when he stated, "No, I don't want to talk to you now, maybe come back later" and the interrogator's response "was not aimed at resolving any ambiguity … but rather at changing [defendant]'s mind"); *United States v. Reid*, 211 F. Supp. 2d 366 (D. Mass. 2002) (holding that defendant's statement, "I have nothing else to say" was an unambiguous invocation of the right to silence), *cited favorably by Tice*, 647 F.3d at 107.

11

that there was "nothing to talk about,"[13] that he would "talk no more,"[14] and that he wanted the investigators to "put [him] in jail."[15] And a close review of the transcript and original recording of the interview reveals that his third request to be taken to jail was followed by 90 seconds of silence, after which detective Grims insisted that defendant give the detective "five minutes" to "finish this one up." *Id.* at 25. Defendant then responded, "Crazy." To be sure, Detective Grims replied, "And we're going to talk to you about something else," to which defendant answered, "Alright, sir." *Id.* But none of these statements affects defendant's clear indication that he wished to stop talking and instead be taken to jail. *See, e.g.*, *Smith*, 469 U.S, at 100 ("[A]n accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."). Indeed, defendant's assertion that he wished to be taken to jail, considered in context with his prior statements, is an unambiguous invocation of the right to silence, which the police did not honor. *Thompkins*, 560 U.S. at 382 (holding that an unambiguous invocation of the right to silence invokes the "right to cut off questioning" (quoting *Mosley*, 423 U.S. at 103)).[16]

Next, the government points to *United States v. Adams*, a case in which the Eighth Circuit concluded that a district court did not commit clear error in concluding that a suspect's statement, "I don't want to talk, man," was equivocal. *See* 820 F.3d 317, 322–23 (8th Cir. 2016). Yet, *Adams* is factually inapposite, as there the suspect "never clarif[ied] his earlier statement or

---

[13] Interview Tr. at 20, 24.

[14] Interview Tr. at 24.

[15] Interview Tr. at 24-25.

[16] *See also Mosley*, 423 U.S. at 104 ("[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'").

otherwise unequivocally invok[ed] his right to remain silent." *Id.* Here, by contrast, defendant repeatedly stated (1) that there was nothing to talk about, (2) that he did not want to talk, and (3) that he wished to be taken to jail. That Detective Grims successfully convinced defendant to keep speaking is of no moment because, as previously stated, *Miranda* created a prophylactic rule to prevent relentless and skilled police interrogators from attempting to change a suspect's mind after an unambiguous and unequivocal assertion of the right to remain silent. *See Campaneria*, 891 F.2d at 1021.[17]

Last, the government argues that defendant's attitude is inconsistent with a scenario in which law enforcement forced defendant to speak against his will. But *Miranda* "is a prophylactic safeguard whose application does not turn on whether coercion in fact was employed." *Smith*, 469 U.S. at 99 n.8. Thus, although defendant may have appeared at ease during parts of the custodial interview, *Miranda* still operates to protect defendant's unambiguous and unequivocal invocation of the right to remain silent.

In sum, none of the government's arguments is persuasive.

---

[17] The government also relies on several cases in which courts found that suspects unsuccessfully invoked their *Miranda* rights. But those cases are also inapposite. Unlike here, where defendant plainly stated that he did not want to talk anymore and instructed, "Put me in jail. We don't have to talk about it … I am ready to go to jail," the cases on which the government relies included truly equivocal or ambiguous statements. *Compare* Interview Tr. at 25, *with Burket v. Angelone*, 208 F.3d 172, 197-98 (4th Cir. 2000) (defendant's statement, "I think I need a lawyer," held insufficient to invoke *Miranda* rights), *United States v. Zamora*, 222 F.3d 756, 765-66 (5th Cir. 2000) (defendant's statement, "I might want to talk to an attorney," held insufficient), *Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999) (defendant's question, "Do you think I need an attorney here?" held insufficient), *and United States v. Mir*, --- F. Supp. 3d ----, 2016 WL 7489102, at *1 (S.D.N.Y. Dec. 13, 2016) (defendant's statement, "Yeah, I don't know," when asked if he wished to speak to FBI agents held insufficient).

## IV.

For the foregoing reasons, defendant's motion to suppress must be granted, and any statements defendant made after he said, "Yeah. I am ready to go to jail," must be suppressed.

An appropriate order will issue.

Alexandria, Virginia
March 31, 2017

/s/ _____
T. S. Ellis, III
United States District Judge